Brinkerhoee, C.J.
The alternative writ in this case sets forth:.
“ That on March 5, 1851, and from that time until May 3, 1852, Perrysburg, aforesaid, was an incorporated town in the State of Ohio, and that ever since May 3,1852, it hath been, and yet is, an incorporated village of said state.
“ That on March 5,1851, the general assembly of Said state passed ‘ an act to incorporate the Dayton and Michigan Railroad Company.’ ; -
“ That on June Í, 1851, said company organized under said charter, and hath ever since been a corporation, entitled to all the franchises, rights and privileges conferred by said charter, or otherwise by law.
“ That at the annual fall election, held in said village of Perrysburg, on the second Tuesday of October, 1852, a vote of the qualified electors of said village was duly taken and de *474 dared, pursuant to due notice thereof given, upon'the question whether the corporate authorities of said village should bo authorized to subscribe $50,000 for and on behalf of said village, to the capital stock of said railroad company: and a majority of said electors then and there voting, voted in favor of and to authorize such subscription.
“ That, pursuant to the authority vested in them by the premises, and particularly conferred upon them by the fifth section of the railroad company’s charter, aforesaid, the corporate authorities of said village, for and on its behalf, did on or about November 8, 1852, subscribe $50,000 to the capital stock of said company.
“ That aftenvard, to-wit, on May 13,1853, the corporate authorities of said village, by virtue of the premises, and of the authority conferred upon them by law, did, for and on behalf of said village, cause to be executed divers bonds of said village, sealed with its corporate seal, and subscribed by its mayor and recorder, and having annexed to the same respectively divers interest warrants, or coupons, duly signed by said recorder; the aggregate of the principal sums of said bonds being $50,000, bearing interest at the rate of seven per centum per annum, as therein stated; and did then issue, negotiate and deliver all said bonds, with the interest warrants, or coupons thereunto attached (said bonds, warrants, or coupons, being regular upon their face), to the said railroad company, in full payment of said subscription to the stock of said company; and the said company, then and there, received the same as such full payment, and delivered to the corporate authorities of said village, certificates of stock in said company, amounting to $50,000.
“ That by each of said bonds, the said village, by the description of ‘ the town of Perrysburg, in the county of Wood,’ acknowledged itself to owe, and promised to pay to the treasurer of said railroad company, or bearer, the sum of money therein mentioned, on January 1,1873, at the treasury of said county, with interest thereon, at the rate of seven per centum per annum, from the first day of January, 1853. The interest to be paid annually, on the 1st day of January, on presenting *475 the coupon for the same at the office of the Ohio Life Insurance and Trust Company, in the city of New York.
“ That exhibit £ A,’ hereunto attached, is an exact copy of one of said bonds, and also of all the others, except that the numbers of the others, and the denomination of some of them, for aught said relator knows, are different.
“ That exhibit£ B,’ hereunto attached, is an exact copy of a coupon attached or belonging to said bond, of which exhibit £ A’ is a copy: and all the coupons attached thereto, or to the other bonds, are similar in form, varying from this only in their numbers and date of payment, and in their amount, if the bonds are of different denominations.
££ That said village regularly paid the interest that accrued on said bonds, for eight years, to-wit, for the years 1853 to 1860, both inclusive; but the interest that has since accrued remains unpaid.
££ That before any default in the payment of said interest, said Samuel Eosdick, in the usual course of business, and in good faith, without any notice of any infirmity therein, and for a valuable consideration, purchased seven of said bonds, each for one thousand dollars (exhibit£ A’ being a copy of one of them), with the coupons thereunto attached, and is still the owner and holder thereof, with the unpaid coupons thereunto attached or belonging.
“ That the remaining bonds, amounting to forty-three thousand dollars, principal, with the unpaid coupons, thereunto belonging, are outstanding in the hands of like bona fide purchasers, for a valuable consideration.
“That, relying on the validity of said subscription and bonds, said railroad company constructed its road from Dayton to Toledo, by the way of said village of Perrysburg, and has ever since its completion, about three years ago, maintained and operated the same.
“ That said Samuel Fosdick has duly demanded payment of the interest remaining due to him as aforesaid, but payment thereof has been refused.
“ That the corporate authorities of said village have hitherto failed, neglected and refused, and do still fail, neglect and re *476 fuse, to levy any tax, or otherwise to provide for the payment of the interest that has accrued on said bonds since 1860; and give it out in speeches that they never will pay either principal or interest of said bonds; falsely pretending that said bonds and coupons have no validity.”
The alternative writ then directs the corporate authorities of the village of Perrysburg to levy a tax sufficient to pay the interest accruing and accrued on said bonds, or. to show cause, etc.
The defendants answer, in substance :
1. That the “grand levy” of Perrysburg for 1852, was, '$127,392; for 1853, $149,033 ; for 1860, $171,363; for 1861, $173,591; and for 1862, $178,488, and no more.
2. That defendants have no moneys belonging to the village, applicable to the payment of the relator’s claim.
3. That defendants “ have been advised, by counsel learned in the law, and they believe, that the said bonds and subscription of stock in the said writ mentioned are illegal and utterly void, and that the said incorporated village had no power by law to make the same, and that these respondents have no power to levy a tax to pay the same.”
The case has been argued and submitted on the alternative writ, and the answer thereto.
The allegations of the alternative writ, as to matters of fact, are not denied in the answer; nor are the matters of fact set forth in the answer controverted by the relator; and the matters of fact set forth in both, therefore, are here taken as true; and the questions before us are questions of law, arising upon the state of facts thus mutually admitted. And these we will now proceed to consider.
The act of March 5,1851, “ to incorporate the Dayton and Michigan Railroad Company” (49 Ohio Laws, 440), among .other things not necessary to extract, provides :
Sec. 5. “ The county commissioners of any county through or in which said road may be located, shall be, and they are hereby authorized to subscribe to the capital stock of said company, any sum not exceeding one hundred thousand dollars ; the corporate authorities of Dayton, Troy, Piqua, Sid *477 ney, Lima, Perrysburg, Maumee City and Toledo, shall also be authorized to subscribe to said railroad any sum not exceeding fifty thousand dollars ; and the trustees of any township in any county through which said road may be located, shall be authorized to subscribe to the capital stock of said railroad company, any sum not exceeding ten thousand dollars; and in making such subscriptions, and in all matters relating thereto, the commissioners of counties, corporate authorities of said cities and towns, and trustees of townships, shall have all the rights, privileges, and poioers, and be subject to the restrictions of an 4 act to authorize the commissioners of Clark county to subscribe stock in railroad companies j passed March 8,1850, so far as the same may be applicable, not inconsistent with the provisions of this act; Provided, that the vote on the question of subscribing stock to said railroad company, in any county, city, town, or township, as provided for in this act, shall be taken at the annual spring or fall election, by giving twenty days’ notice thereof, in the manner provided for in the act above referred to, except as modified by this act; and provided further, that a majority of all the voters voting at such election shall vote for subscription.”
And the eighth section of said act provides :
That44 said company shall have power to sell or negotiate the notes or bonds of the company, issued by such company, or any notes or bonds of every other railroad company, county, city, town or township that said company may at any time hold or own, at such times and at such places, either within or without this state, and at such rate and for such prices as may be deemed best fitted to advance the interests of the company; and if such bonds or notes are thus sold at a discount, such sales shall be as valid in all respects as if they were sold at their par value; nor shall the sale or negotiation of any such notes or bonds be invalidated for any informality in the issuing, execution, transfer or sale of the same.”
The provisions of the act 44 to authorize the commissioners of Clark county to subscribe stock to railroad companies” (48 Ohio Laws, 291), adopted into the act first above mentioned, and applicable to the case before us, are as follows :
*478 Sec. 2. “ The commissioners of said county, for the purpose of paying the stock subscribed under this act, are hereby authorized to borrow the necessary amount of money, for which they shall issue bonds or obligations of the county, in amounts not less than one hundred dollars, which bonds or obligations shall be made negotiable, bearing interest, payable annually, at such place, and at such rate, not exceeding seven per centum per annum, as may be agreed upon; and such bonds or obligations may be made redeemable at such time as may be deemed expedient by said commissioners; or such bonds or obligations, or any part thereof, may be issued directly to said company in payment of said stock, as said commissioners and the officers of said company may agree; and all bonds and obligations issued and negotiated by said commissioners, trustees or town council, and ‘ regular ’ on the face thereof, shall, in the hands of said company, or of any bona fide holder thereof, be deemed and taken in all courts and elsewhere, as conclusive evidence of the regularity of everything required by this act to be done preliminary to the issuing and negotiation of such notes or obligations.”
Sec. 4. “ The faith of the county, and the net profits or dividends upon the stock so subscribed, by the county, shall stand pledged for the payment of the indebtedness and in terest which may become due from said county under this act; and it is, moreover, hereby made the duty of the commissioners and auditor of said county, from and after the contracting of any indebtedness against said county, under this act, to add such per centum upon the tax duplicate of said county, annually, over and above the dividends or net profits aforesaid, to pay the accruing interest arising under this act, and also to provide a sinking fund of such amount as they may deem expedient ; and the moneys so levied, when collected, shall be applied to the purpose aforesaid, and to none other.”
The new constitution of 1851 took effect September first of that year. By reference to the legislative acts above referred to, enabling the corporate authorities of Perrysburg to subscribe stock, issue bonds, etc., it will be seen they were passed prior to that date; while, from the allegations of the alternative writ, it will be seen that all the acts done under and in pursu *479 anee of the authority they were supposed to confer, were done after that daté; and thus, at the outset of this case, comes up the old question passed upon by the majority of this court, in Cass v. Dillon, 2 Ohio St. Rep. 607, whether, by article 8, section 6, of the new constitution, and the first section of the schedule thereto, these acts were not, by implication, repealed. That case decided against the claim of an implied repeal. We do not now propose to re-argue the question then made. The argument has been already exhausted. And whether the decision then made was right or wrong, it has, in subsequent cases, been so repeatedly and uniformly followed, including the case of Commissioners of Knox County v. Nichols and Wife, decided at the present term (ante p. 260j; and such immense interests have been invested on the faith of it, that we regard it as a foregone conclusion that it must now stand. Stare decisis.
The next question made by the defendants, in argument, is this : The now village of Perrysburg was originally incorporated, by the name of “ the town of Perrysburg,” by a special act of the general assembly, and it so remained until after the passage of the Dayton and Michigan railroad act, and the Clark county act, above mentioned, and up to the time of the taking effect of the general act of May 3, 1852, “ for the organization of cities and incorporated villages.” 3 Curwen’s St. 1835.
By the first section of this latter act it is provided: “ That all corporations which existed when the present constitution took effect, for the purposes of municipal government, either general or special, and described or denominated in any law then in force, as cities, towns, villages or special road districts, shall be, and they are hereby organized into cities, and incorporated villages, with the territorial limits to them respectively prescribed, or belonging, in manner following: All such municipal corporations, as in any such law are denominated cities, shall be deemed cities; and those denominated towns, villages or special road districts, shall be deemed incorporated villages; to be respectively governed as cities, or incorporated villages, and in case of the latter, for general or special purposes, as provided in this act; and all acts now in force, for the organi *480 za-tion or government of any such municipal corporations, shall be, and they are hereby repealed: Provided, that such repeal shall not destroy, or bar, any right of property, action, or prosecution, which may be vested, or exist, at the time this act takes effect.”
The last section of this act provides, “ that this act shall take effect from and after the fifteenth day of May next.”
Now, it is contended in behalf of the defendant, 1st, that although the act was passed May 3, 1852, and the words of its last section declare that it “ shall take effect from and after the fifteenth day of May next,” yet it really took effect from and after the fifteenth day of May, 1852 — twelve days after its passage — instead of from and after the fifteenth day of May, 1853, in accordance with the letter of its last section. And, 2d, that the corporate existence of the town of Perrysburg was, by the repealing clause in the first section of the general act,- annihilated; that a new and distinct'corporate body was brought into being by the name of “ the incorporated village of Perrysburg,” to which the enabling acts granting to the corporate authorities of the town of Perrysburg power to subscribe stock to the railroad company, issue bonds, etc., had no application ; and the vote for subscription of stock in the railroad company, the subscription, and the issue of bonds in payment of such subscription, having all taken place after the taking effect of the general act, the bonds were issued without authority of law, and are -therefore void.
Although the letter of the last section would bind us down to a different conclusion, yet we are unanimously of opinion that the general act “ to provide for the organization of cities and incorporated villages,” did take effect from and after the fifteenth day of May, 1852, the month in which it was passed. And this for three reasons:
1. The act was passed in obedience to a mandate of the constitution, then recently adopted, which, in article 13, section 6, provides that “ the general assembly shall provide for the organization of cities and incorporated villages, by general laws,” etc., and we can imagine no good reason why the general assembly should intend to delay the taking effect of *481 such an act for more than a year after it was matured and passed.
2. Because there are provisions in the 59th and 87th sections of the same act, which are utterly inconsistent with the-idea that the taking effect of the act was intended to he postponed until “from and after” the fifteenth of May, 1853. Eor the 59th section provides, that the “ voters of each ward within the several cities shall, on the first Monday of April, A. D. one thousand eight hundred and fifty-three, elect, by a plurality of votes, two trustees,” etc. And it is provided in the 87th section, “ that until the first Monday in April, one-thousand eight hundred and fifty-three, and until a police judge shall be elected and qualified, the mayor of any such, city shall have all the powers and jurisdiction which are by this act vested in the police judge, and shall hold the police court in like manner, and with like jurisdiction and powers, as is required of the police judge, and shall be entitled to demand and receive the same fees and compensation as is in this act,, or as may be provided by the city council, for the police judge- or police court.”
3. In cases of doubt as to the proper interpretation of wills and contracts, it is a familiar rule that evidence is admissible to show the circumstances surrounding the party, or parties, at the time of the making of the instrument to be interpreted; and thus to place the court upon the stand point of the party or parties whose intentions are to be ascertained; and to-enable the court to see things in the light in which he or they saw them. And, on principle, I know of no good reason why, on a question like this, we may not, in analogy to the rule referred to, look into the history and progress of the bill which finally ripened into this act, during its pendency in, and passage by the general assembly, as shown by the journal of the two houses of that body. And that we may do this is distinctly held, in The Southwark Bank v. The Commonwealth, 26 Penn. St. Rep. 446. We have accordingly looked into those journals, and find that the bill “ to provide for the organization of cities and incorporated villages ” was first introduced into the senate, by the committee on municipal corno *482 rations, on the 28th day of March, 1852. It went from one house to the other, with amendments, until April 27, 1852, when the house fixed by amendment, the “ fifteenth day of May next,” as the time when the act should take effect. And. on the next day, the 28th of April, 1852, the amendments of the house were finally agreed to by the senate, and the bib was actually passed. Senate Journal of 1852, vol. 1, p. 678. The bill then went to the committee on enrollment, and was reported to the senate as correctly enrolled, on the 3d day of May, 1852; and, on the same day, it was signed by the presiding officers of the two houses of the general assembly. The bill, though not signed until the 3d day of May, was actually and finally passed, by the concurrent vote of the two houses, on the 28th day of April; and it is clear that, in the minds of the legislators who passed it, the bill spoke from that day.
It being apparent then, from these considerations, that the general act for the organization of cities and villages took effect from and after the fifteenth day of May, 1852, does the ■consequence follow, as claimed by the defendant, that all preexisting municipal corporations were “ wiped out of existence,” and all prior acts granting to them special powers or privileges became thereupon inoperative, or were, by force of this general act, repealed? We are unable to arrive at such .a conclusion. Neither the corporate existence nor the corporate identity of the municipal corporations of the state were .affected by the general act for the organization of cities and villages. Some of them took, under its operation, a different legal designation — as incorporated villages, instead of towns; the particular mode of their organization was somewhat changed, and their powers, privileges, rights and duties, were restricted, enlarged, or modified; but their territorial limits remained the same as before; legal obligations incurred by or to them remained unchanged; and their corporate identity was no mOre affected by a re-organization, under the general law, than is the personal identity of a feme sole by marriage, in wirtue of which her name is changed, and her powers, privileges, rights and duties, are, in law, enlarged, restricted, or modified. The corporate life of'the village of Perrysburg was *483 a continuation of the life of the town of Perrysburg. It was a continuation; not an annihilation and a recreation. Even the official designations of the officers respectively of incorporated villages organized under the general act, were the same as under the special acts organizing them as “towns;” they were still a mayor, recorder, and trustees, which, together, constituted a council. (Section 47.) And the officers in office, at the time of the taking effect of the general act, were, under its provisions, continued in office until the first Monday of April following, and until their successors should be elected and qualified. (Section 109.) And, while we are upon this point, it is not unworthy of notice, that the “ act to incorporate the Dayton and Michigan Railroad,” under the authority •of which the subscription of stock, and the issuing of bonds in this case, were made, gives n-o countenance to the idea that a mere re-organization of the municipality of Perrysburg should work a recall or abolition of the powers therein conferred. The grant of power is to the “ corporate authorities of Dayton, Troy, Piqua, Sidney, Lima, Perrysburg, Maumee City, and Toledo;” to the corporate authorities in the general, without apparent reference to their particular legal designation under then existing laws — and the reference to places is to geographical entities, rather than to the corporate names by which, in law, they might be distinguished. The authority to issue the bonds now sought to be enforced, then, did not cease by reason •of any annihilation of the corporate body on which the authority was conferred. Was this authority withdrawn by repeal?
That there is any express repeal of the Dayton and Michigan railroad act, or of the- Clark county act (so called), eo nomine, is not claimed; but the first section of the general act “ to provide for the organization of cities and incorporated villages,” after classifying the several existing municipal corporations, provides “ that all acts now in force, for the organization or government of any such municipal corporations, shall be and they are hereby repealed.” But the subscription for railroad stock in this case mentioned, and the issue of bonds .to pay for the same, were made under the act “ to incorporate '.the Dayton and Michigan railroad,” and the act “ to authorize *484 the commissioners of Clark county to subscribe stock to railroad companies.” These were not acts either for the organization or government of municipal corporations, in the ordinary sense of those terms. Neither their titles nor provisions indicate that such was their character. The object and policy of those acts was to encourage and promote the construction of railroads, by enabling municipal corporations and quas't corporations to lend their credit to railroad companies in aid' of their several enterprises. On the contingency that a municipal corporation should act upon the authority thus con ferred, one of the ordinary functions of government, to-wit • that of taxation for the payment of the liabilities thus assumed^, was authorized and required to be exercised to a greater extent than ordinary; but still it remains true, as we think, thattnese acts would never strike the common mind, or the mind: of a legislative body, as being acts for the government of municipal corporations; and it seems to me that we would be-amenable to the charge of straining the ordinary meaning of language, in order to screen a corporation from the payment of a debt voluntarily incurred by the vote of its members, and now in the hands of bona fide holders for value, if we were to-hold that they were so.
And this conclusion is greatly strengthened, if not made^ certain, by the fact that there were a great many acts in force up to the time of the enactment of the repealing clause above-referred to, to which that clause did obviously apply. Prior to the adoption and taking effect of the constitution of 1851, which prohibits the passing of special acts conferring corporate powers, and requires the general assembly to “ provide-for the organization of cities and incorporated villages by general laws,” it was customary, whenever the people of a city,, town, or village, desired a corporate municipal organization and government, for them to apply to the general assembly for a special charter — a special act of incorporation — providing for its organization and government. These were liberally granted; and, so far as we know it was under such, .special acts of incorporation that all the municipal corporations of the state were organized and governed up to the tiinft *485 of the-passage of the general act, under the new constitution, containing the repealing clause referred to. It is to these special acts to which that repealing clause obviously refers, and to which a majority of the court are of opinion that it applies exclusively. And an additional reason for this holding will appear in what follows on the question which we are next required to consider; and which is this :
By the seventeenth section of the act of March 11,1853, to amend the act entitled ‘ an act to provide for the organisation of cities and incorporated villages,’ it is provided, that for the purpose of paying the interest on the public debt of any municipal corporation, the council thereof shall have power, and it is hereby made their duty, to levy and collect annually on the property appraised and returned as aforesaid, a sum not exceeding six mills on the dollar sufficient to fay und satisfy the whole of such interest as the same accrues.” 3 Curwen’s Stat. 2159. And this provision was an enlargement of the powers granted by the act of May 3,1852, of which it was an amendment, which, in phraseology precisely ■similar, except as to the rate authorized to be levied, limited the rate authorized , to be levied to two mills on the dollar; while the answer of the defendant, the truth of which is not controverted, shows by its exhibit of property in the village •of Perrysburg, real and personal, appraised and assessed for several years past, that a much larger rate than six milla ■on the dollar would be required to be levied in order to meet the accruing interest on these bonds. And hence it is contended, in behalf of the defendant, that this amendatory act, by implication, repeals, at least pro tanto, so much of the Clark county act as authorizes and requires the levy of a tax .at any rate absolutely sufficient to meet the accruing interest ■on the bonds issued. The question thus made is not without difficulty; but there is a rule of statutory construction, well established by authority, and reasonable in iiself, which, it ■seems to us, leads to a satisfactory solution. In Sedgwick, ■on Statutory Law, 123, it is said: “ In regard to the mode in which laws may be repealed by subsequent legislation, it is laid down as a rule, that a general statute without negative *486 words, will not repeal the particular provisions of a former one, unless the two acts are irreconcilably inconsistent. The reason and philosophy of the rule is,” he continues, “ that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to-give the latter act such a construction in order that its words-shall have any meaning at all.” And the rule is well illustrated by the case of Williams v. Pritchard, 4 D. & E. 2, which he cites, that “ where an act of parliament had authorized individuals to inclose and embank portions of the soil under the river Thames, and had declared that such land should be ‘free from all taxes and assessments whatsoever,’ the land tax act, subsequently passed, by general words embraced all the land in the kingdom; and the question came up before the king’s bench, whether the land mentioned in the former act had been legally taxed; and it was held that the tax was illegal.” The rule is also laid down in Gregory’s case, 6 'Coke’s Rep. 19 b., where, it is said, “ a later statute in the affirmative shall not take away a former act; and eo potius if the former be particular, and the latter general.” The rule is also recognized in Dwarris on Statutes, 658-9 ; in Williams v. Williams, 4 Selden, 533; and in Brown v. County Commissioners, 21 Penn. St. R. 43. This last case presented a question of statutory construction which is closely analogous to the question here before us. There, the legislature of Pennsylvania had, by special act, established a county board, for the county of Philadelphia, consisting of the members, for the' time being, of the senate and house of representatives from the city and county; and the act declared that it should not be lawful for the county commissioners of that county to levy any tax or borrow any money without the consent of the county board. By a subsequent general act, “relating to counties and townships and county and township officers,” it was. declared that “the corporate powers of the several *487 counties and townships shall be exercised by the commissioners and supervisors thereof respectively.” It was held by the supreme court of the state, that this provision of the general act, did not repeal, by implication, the provisions of ^he prior special act above referred to; and Black, C.J., delivering the opinion of the court, says : “ It seems to be well settled, that a general statute without negative words, can not repeal a previous statute which is particular, even though the provisions of one be different from the other. Precisely such are the statutes before us. It is against reason to suppose that the legislature, in framing a general system for the state, intended to repeal a special act which the local circumstances of one county had made necessary.” Applying this remark and the rule which it sanctions, to the case before us, we say— it is against reason to supp' se that the legislature, in framing a general system for the organization and ordinary government of municipal corporations, intended to repeal, wholly or in part, pre-existing special acts which had been pa.ssed in view of the supposed interests and wants of particular localities, in respect to a subject matter not connected with their organization or ordinary government.
Again, it is urged in behalf of the defendant, that these bonds were issued in the name of the “town” of Perrysburg — - the name of the corporation prior to the taking effect of -the general act for “ the organization of cities and incorporated villages” — instead of in the name of “the incorporated village of Perrysburg,” which, under the operation of that act, was its true legal designation at the time the vote was taken, the subscription of stock made, and the bonds were issued. But this was a mere misnomer which amounts to nothing. See Milford and Chillicothe Turnpike Co. v. Brush, 10 Ohio Rep. 111, and Angelí & Ames on Corporations, section 99.
Other questions are incidentally made and discussed by counsel in argument,- a review of which by us would certainly be tedious, and, we think, is unnecessary. We have considered and passed upon what seem to us to be the controlling questions in the case; and the final conclusion at which the major *488 ity of the court have arrived, is, that a peremptory mandamus •ought to be awarded as prayed for in the relation.
Scott, Wilder and White, JJ., concurred.
Ranney, J., adhering to his opinion in Cass v. Dillon, 2 Ohio St. Rep. 607, and Knox County v. Nichols, decided at the present term (ante p. 260), dissented.